FILED
RICHARD W. NAGEL
CLERK OF COURT

20 JAN 28 PM 3: 44

U.S. DISTRICT COURT
SOUTHERN DIST OHIO
WEST DIV CINCINNATI

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
AT CINCINNATI

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* Melissa Brown <br><br> PLAINTIFF <br><br> v. <br><br><br> ALCHERA INCORPORATED <br><br> DEFENDANT | Civil Action No: 1:20cv74 <br> **COMPLAINT FILED *IN CAMERA* AND UNDER SEAL** <br> Pursuant to 31 U.S.C. § 3730(b)(2) <br> **TRIAL BY JURY REQUESTED** <br><br> Judge Douglas R. Cole |

## COMPLAINT

Plaintiff United States of America, *ex rel.* Melissa Brown, states as follows for its cause of action against Defendant Alchera Incorporated, and the Relator Melissa Brown as to her separate counts of retaliation:

### JURISDICTION AND VENUE

1. This is an action to recover damages and civil penalties arising out of false claims presented by the Defendant to the United States. The action arises under the provisions of Title 31 U.S.C. § 3729, *et. seq.*, the False Claims Act (the "Act" or "FCA"), which provides that the United States shall have exclusive jurisdiction of actions brought under the Act.

2. This is an action for the Relator to recover damages arising out of employment retaliation by the Defendant under both the Act and Ohio state law.

3. Subject matter jurisdiction in this Court is therefore based upon 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

1

4. Section 3732(a) of the Act provides that "[a]ny action under 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." An act proscribed by Section 3729 occurred in the Southern District of Ohio, including Hamilton County, Ohio, which is located in the Cincinnati Division of the Southern District of Ohio.

5. The Cincinnati Division is the appropriate assignment of this case in the Southern District of Ohio with the Defendant's Ohio place of business located in Clermont County, Ohio, and the applicable activities occurring within counties of the Cincinnati Division.

6. Under the Act, this Complaint is to be filed *in camera* and remain under seal for a period of at least sixty days and shall not be served on the Defendant until the Court so orders. The United States may elect to intervene and proceed with the action within sixty days after it receives the complaint, material evidence, and any other necessary information.

7. As required by the Act, 31 U.S.C. § 3730(b)(2), Relator has provided to the Attorney General of the United States and to the United States Attorney for the Southern District of Ohio, simultaneously with the filing of this Complaint, a statement of substantially all material evidence and information related to this Complaint. This disclosure statement is supported by evidence establishing the Defendant's submission of false claims to the government.

**PARTIES**

8. The United States of America is the Plaintiff in this action. At all times material to this Complaint, the Department of Health and Human Services ("HHS") was an agency and instrumentality of the United States, and its activities, operations, and contracts were paid from federal funds. At all times material to this Complaint, the Centers for Medicare and Medicaid

2

Services ("CMS") was an agency and instrumentality of the United States, and its activities, operations, and contracts were paid from federal funds. At all times material to this Complaint, the term "Medicaid" is used for each respective state in which the Defendant provided services. Each state Medicaid is an agency and instrumentality of its respective state and its activities, operations, and contracts were partially or fully paid from federal funds allocated to the respective states. At all times material to this Complaint, Defendant was paid government funds, part of which were federally allocated funds through CMS, for services provided to government beneficiaries allocated through Medicaid and/or state Department of Developmental Disabilities, including the Ohio Department of Developmental Disabilities ("DODD").

9. Relator Melissa Brown ("Relator") is a resident and citizen of the United States of America and of the State of Ohio. Relator voluntarily provided information to the federal government regarding violations by the Defendant and is the original source of such allegations.

10. Defendant Alchera Incorporated ("Defendant") is a Nevada company, registered to do business and doing business in Ohio and other states that, for all times relevant to the Complaint, operated remote monitoring services for disabled and elderly individuals for which federal funds were paid to Defendant for such services.

11. For all times relevant to this Complaint, Defendant managed and operated its remote services contracts for government beneficiaries in Ohio and other states in a manner that caused false claims to be billed to federal government funded programs, including Ohio DODD Medicaid Waiver programs, resulting in federal funds being paid for false claims in violation of the Act. For all times relevant to this Complaint, the Defendant was a government funded service provider.

## FACTS

12. Defendant billed the government for services rendered, or billed as if rendered, to government beneficiaries in Ohio and in other states. For all beneficiaries referred to in this Complaint, these beneficiaries were beneficiaries of government programs for which federally allocated funds were paid to Defendant.

13. For services provided to government beneficiaries to be eligible for reimbursement, government payers require that providers meet certain eligibility and reimbursement requirements, including providing medical services that are (1) actually performed as billed and (2) reasonable and necessary for the government beneficiaries who are patients.

14. Defendant knowingly submitted and/or caused to be submitted false claims to the government for services provided to government beneficiaries in violation of the Act.

15. From a time unknown, but from at least 2018 through the present, the federal government was billed and paid for one or more of the Defendant's FCA violations that the Defendant caused to be submitted to federal government payers for services as set out in this Complaint.

16. In its Ohio state corporate filing, Defendant describes itself as a company that "provides monitoring equipment and software to support senior safety and independence and for use with other special needs communities who may benefit from safety and activity monitoring."

17. Defendant primarily does business as Safeinhome.com, a company advertising it can keep disabled and/or elderly patients safe through remote monitoring and alerts to family members.

4

18. Defendant markets itself to state DODD beneficiaries, including Ohio DODD beneficiaries.

19. In Defendant's website, it states that it can provide DODD services "because of the flexibility of the system, there are numerous instances where SafeinHome works, to include: Individual Option Waivers, Level 1 Waivers, to replace On Site On Call, After work/school, Elopement risks, Behavioral issues with staff, Hearing impaired, and wheel chair users to name a few."

20. To further entice government beneficiaries, Defendant makes the case that the cost is borne by the government: "The SafeinHome system can be paid for using Medicaid Waivers for Remote Supports. This includes Independent Option (I.O.) waivers. The system and service can also be acquired using County DoDD Funds, and is also an approved expenditure for STABLE accounts."

21. Defendant also describes itself as "a leading remote support technology company providing full service and support to clients in 39 states. With over 8 million hours of user experience, SafeinHome's **patented technology** provides **Independence without Isolation or Intrusion** [sic] to Adults with Developmental Disabilities and Seniors Aging in Place." (emphasis original).

22. Defendant provides these monitoring services through motion sensors, door sensors, cameras, and interactive monitoring devices. Specifically for Ohio, Defendant claims that "[e]ach SafeinHome Ohio DODD installation comes with a 2-way video communication tablet should the care recipient need to reach someone. This allows access to SafeinHome's professionally trained Remote Support Staff. The Remote Support Staff is immediately available 24 hours a day, 7 days a week."

5

23. The 24/7 access is a linchpin to Defendant's ability to provide remote monitoring that would meet government payor requirements.

24. Defendant operates in thirty-nine (39) states.

25. The FCA violations occurred as part of Defendant's practices involving the following two schemes: (1) failure to provide services for which Defendant was paid and (2) violating the rights of government beneficiaries.

26. The goal of any state DODD program is to keep beneficiaries at home rather than having these individuals be placed in group homes or otherwise institutionalized. By keeping beneficiaries independent with remote support, Ohio, the federal government, and other states can keep overall government medical and support costs lower. Beneficiaries and their families also endorse the programs because they allow better self-determination and independence for patients while providing a level of medical safety and security.

27. The centerpiece of remote monitoring services is actual remote monitoring during the hours in which remote monitoring is required to be performed. These remote services worked with twenty-four (24) hour, seven (7) day access to Defendant's support team, to provide a direct connection between a beneficiary and the company. Defendant tried to accomplish the remote monitoring through a tablet system with two-way video support or through an Amazon Alexa programmed for the support system. The technology for the remote support services could also include sensors, wearable medical technology, cameras, and Ring brand doorbells. Government beneficiaries would each have an Individual Service Plan ("ISP") with a contract for payment with Defendant, providing the requirements for the service under the applicable waiver program.

28. Defendant failed to provide remote services for which it was being paid and failed to provide 24/7 support. These failures included no monitoring during monitoring

6

hours, no two way communications, no outgoing communications, no adaptive technology, no medical seizure monitoring, and no elopement prevention services.

29. Relator informed Defendant of these problems on a repeated basis, both orally and in writing.

30. The following are examples of Defendant's failures to provide remote monitoring services for which it was being paid (to protect patient confidentiality, names are being withheld):

-Beneficiary 1 went at least eight (8) days without any monitoring;

-Beneficiary 2 went at least three (3) days not being monitored and his electricity went out without Defendant detecting it;

-Beneficiaries 3 and 4 – this couple had no means of outgoing communication to Defendant for weeks;

-Beneficiary 5 went over six weeks with her camera not functioning;

-Beneficiary 6 due to dexterity issues, had an Alexa unit installed for two way communication, but Defendant's staff stated that "I have no idea how this is supposed to work, we've never used one of these before." The two way communication through Alexa was not operational despite payments to Defendant for these services;

-Beneficiary 7, who was an elopement risk, received Defendant anti-elopement services, but Defendant installed a system that was too slow for effective elopement containment. In fact, Defendant should have had sensors to detect a door opening, but the beneficiary was found the next day after eloping.

-Beneficiary 8, who suffered seizures, received a seizure bracelet and connected tablet for two way communication to Defendant. Reports were being made that there were no

7

seizure activities, but, in reality, the tablet had never been connected to the internet and Defendant was being paid for monitoring services it never provided; and

-Beneficiary 9 did not receive the remote services support Defendant had agreed to provide. Defendant promotes that it has sensors to remotely track movement in a beneficiary's home and that its well trained staff and system can provide reports to health care providers. In Beneficiary 9's case, her neurologist needed a report of activities that Defendant could not, or would not, provide.

31. Defendant did not train its staff or have standard procedures in place, which contributed to these problems of not providing services. For instance, the Relator, two other senior sales representatives, and a technician, never received any training. In fact, the technician did not receive separate training on selecting or installing the necessary monitoring equipment. Instead of trained assessments, government beneficiaries would receive equipment based on sales representatives selecting from a list of the remote technology Defendant could provide.

32. There was no training to assess employee knowledge, no training on the technology, no training on specifications (*i.e.* the number of sensors needed in a beneficiary's home), and/or no training on the technology's efficacy in meeting the needs of the patients. Training is crucial to providing effective remote monitoring.

33. The lack of training had consequences. For example, with the elopement issue, elopement cannot be averted without immediate alerts from sensors. However, Relator and other Defendant employees were giving beneficiaries and their families a false sense of security because they were not trained on the limitations and efficacy of Defendant's technology. Instead, they were told to promote Defendant's marketing of providing "peace of mind"

when, in reality, a government beneficiary successfully eloped due to Defendant's remote monitoring failure.

34. Even with remote monitoring services, there are limits to the monitoring and periods where a beneficiary's ISP requires cameras must be turned off. This protects the beneficiary's rights to privacy. Defendant failed to meet its remote support requirements by keeping cameras on during periods where the cameras were to be turned off. In fact, for at least one beneficiary, Beneficiary 2, Defendant ignored formal requests to have the beneficiary's camera turned off during non-monitoring hours. This is both a violation of the beneficiaries' rights and their ISPs.

35. Defendant was also well aware of these problems through at least three avenues: (1) knowledge at the beginning of the services when Defendant knew it could not or would not provide the paid for services, such as the two-way monitoring with Beneficiary Five; (2) knowledge during the lack of services because Defendant was not performing as it was required to do; and (3) Relator's oral and written notices during and after the failure to provide services. Defendant violated the False Claims Act in failing to provide these services and making claims for payment when it knew it did not provide the services and/or provided services at a level below what was being paid. Defendant also violated the FCA when it failed to return overpayments when it realized that it was being paid for services it did not provide and/or provided services at a level below what was being paid.

36. Although Relator worked in Ohio, Defendant's problems occurred nationwide. The remote monitoring services were all performed from one location in California. Upon information and belief, the same technology and plans, or lack thereof, were implemented in all thirty-nine (39) states Defendant provided services. The lack of training and follow-up was systemic in the company. In fact, relator spoke with a California employee on the elder care

9

side of Defendant's business model and the employee reported that often her clients were "offline" and there was no tech support in California. As a result, the California employee actually monitored herself to see if her systems were operational because she did not trust Defendant to do so. The California employee also reported to the Relator that she often had to go to the homes of her beneficiaries to make tech adjustments, which Relator needed to do as well despite the fact Defendant failed to provide training for its employees to make these adjustments.

37. The exact dates, times submitted, and/or names of government beneficiary patients who were the subjects of billings in violation of the False Claims Act are within the exclusive control and knowledge of the Defendant. Relator personally knows of the FCA violations and the Defendant's knowledge of the false claims because of the knowledge Relator gained from working for Defendant.

38. Relator began working for Defendant in November of 2018.

39. Relator realized there were issues with Defendant's services and made Defendant aware of Defendant's failures to provides services for which it was billing government payers. Defendant terminated Relator on August 2, 2019, after Relator had repeatedly brought her concerns to Defendant.

40. As used herein, the word "knowingly" means that a person, with respect to information (a) has actual knowledge of the information, (b) acts in deliberate ignorance of the truth or falsity of information, or (c) acts in reckless disregard of the truth or falsity of the information.

## COUNT I
## FALSE CLAIMS ACT - 31 U.S.C. § 3729(a)(1)(A)

41. Paragraphs 1 through 40 are realleged as though fully set forth herein.

42. From at least 2018 through the present, Defendant knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to an officer, employee or agent of the United States (the "Government") for payment or approval in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

43. These false or fraudulent claims include making materially express and implied certifications therein upon which the Government relied to pay the false claims.

44. As a direct and proximate result of the Defendant's acts, as described in this Complaint, the Government sustained damages and is entitled to recovery as provided by the False Claims Act in an amount to be determined at trial, plus a civil penalty.

## COUNT II
## FALSE CLAIMS ACT - 31 U.S.C. § 3729(a)(1)(B)

45. Paragraphs 1 through 40 are realleged as though fully set forth herein.

46. From at least 2018 through the present, Defendant knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to get false or fraudulent claims allowed or paid in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

47. These Defendant's knowingly false records or false statements were material to the false and fraudulent claims for payments they made and continue to make to the government for reimbursements and benefits.

48. The Defendant's materially false records or false statements are set forth above and include, but are not limited to, government payer enrollment applications and certifications, the paper and/or electronic claims for payment, and the express and implied certifications therein.

11

49. These said false records or false statements were made, used or caused to be made or used with the Defendant's actual knowledge of their falsity or with reckless disregard or deliberate ignorance of whether or not they were false.

50. As a direct and proximate result of the Defendant's acts, as described in this Complaint, the Government sustained damages and is entitled to recovery as provided by the False Claims Act in an amount to be determined at trial, plus a civil penalty.

## COUNT III
## FALSE CLAIMS ACT - 31 U.S.C. § 3729(a)(1)(G)

51. Paragraphs 1 through 40 are realleged as though fully set forth herein.

52. From at least 2018 through the present, Defendant knowingly made, used or caused to be made or used false records or false statements, material to an obligation to pay or transmit money or property to the Government, or knowingly concealed and upon information and belief continue to conceal an obligation to pay or transmit money or property to the Government, or knowingly and improperly avoided or decreased, and upon information and belief continue to knowingly and improperly avoid and decrease, an obligation to pay or transmit money or property to the Government in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G), and in violation of 42 U.S.C. § 1320a-7k(d).

53. These false records or false statements were made, used or caused to be made or used with these Defendant's actual knowledge of their falsity or with reckless disregard or deliberate ignorance of whether or not they were false, in an effort by the Defendant to avoid paying the Government back the overpayments for services provided to government beneficiaries that were not properly paid to the Defendant.

54. As a direct and proximate result of the Defendant's acts, as described in this Complaint, the Government sustained damages and is entitled to recovery as provided by the False Claims Act in an amount to be determined at trial, plus a civil penalty.

## COUNT IV
## FALSE CLAIMS ACT RETALIATION

55. Paragraphs 1 through 40 are realleged as though fully set forth herein.

56. During Relator's respective employment at Defendant, Relator complained to Defendant about the problems in the Defendant's services and billings including the false claims violations alleged herein.

57. Relator's actions in internally reporting the Defendant's violations were protected activities within the meaning of 31 U.S.C. § 3730(h).

58. Defendant was aware of Relator's complaints about its practices violating government payer requirements.

59. Relator's complaints about Defendant's violations placed Defendant on notice that Relator's complaints could lead to a *qui tam* action.

60. Defendant terminated Relator's employment on or about August 2, 2018, in retaliation for her actions in making allegations subject to the False Claims Act, for Defendant's belief that Relator was assisting in a *qui tam* investigation, and/or for Defendant's belief that Relator had, or would, file a *qui tam* action.

61. Defendant terminated Relator in an effort to threaten, harass, and discriminate against her, in violation of 31 U.S.C. § 3730(h).

62. Defendant's actions damaged Relator in violation of 31 U.S.C. § 3730(h), in an amount to be determined at trial.

63. Pursuant to 31 U.S.C. § 3730(h), Relator is entitled to litigation costs and reasonable attorneys' fees incurred in the vindication of her reputation and in the pursuit of this retaliation claim, in addition to receiving damages for Defendant's retaliatory conduct, including any applicable punitive damages.

## COUNT V
## STATE RETALIATION CLAIM

64. Paragraphs 1 through 40 are realleged as though fully set forth herein.

13

65. Relator has received certified training with the Ohio Department of Developmental Disabilities (herein "ODDD") and is a mandated reporter of Major Unusual Incidents ("MUI") involving disabled individuals who are receiving remote support/personal care from an accredited agency provider or contract provider.

66. Relator, as an employee of Defendant, was a community health worker in accordance with ORC 4723.33, as she was accredited provided by ODDD to provide medical technology assessments for disabled individuals in Southern Ohio and make recommendations of technology support that was to be provided to the individuals by Defendant.

67. Ohio was the first state to integrate home technology care into its care for its Ohio disabled population receiving services through the ODDD, and Ohio is a model for other states to initiate similar home care programs.

68. During the Course of her employment, Relator, made multiple verbal and written reports to Supervisors that Defendant was failing to provide services to disabled individuals in the care of ODDD.

69. Issues that Relator reported included (a) charging parties for home monitoring services when such monitoring did not occur; (b) repeated "blackouts" of technology services for disabled individuals for extended periods of time without Defendant's knowledge or intervention; (c) Ongoing privacy violations due to continuous monitoring of customers when not requested by the customer; (d) Ongoing violations of various Medicaid rules and regulations; and (e) ongoing failure in operation of technology and monitoring of customers resulting in safety concerns for the individual.

70. On June 19, 2019, Relator reported in writing an incident that ODDD mandated that be reported as MUI which the Defendant dialed to report. In that report, Relator noted that Defendant did not have protocols in place to deal with MUIs nor was adequate training provided that was in compliance with ODDD.

71. On July 9, 2019, Relator provided a written report to Defendant again discussing a neglected MUI that Defendant failed to report.

72. On July 31, 2019, Relator emailed a report to Defendant Management as an Official Complaint citing various violations of ODDD regulations and service disruption issues as identified in paragraph 69 of the Complaint.

73. In her July 31, 2019, report, Relator provided ten (10) separate client examples where Defendant failed to provided technology services to customers or neglected MUI reports.

74. Defendant did not respond to Relator's report or take corrective action to remedy the issues Relator brought forward.

75. On August 2, 2019, Defendant notified Relator that her employment was terminated.

76. Said termination was in violation of ORC 4113.51-53, the Ohio Whistleblower Act.

**WHEREFORE**, Plaintiff and Relator respectfully request:

1. That a judgment be entered against Defendant in the amount of the false claims paid;
2. That the amount of such judgment be trebled pursuant to 31 U.S.C. § 3729(a);
3. That a civil penalty in an amount not less than $5,000.00, nor more than the statutory maximum, per violation, be imposed upon the Defendant;
4. That this Court award Relator the maximum recovery allowed under the Federal False Claims Act;
5. That this Court award Relator her full damages for her retaliation counts, including punitive damages, attorneys' fees, costs, and interest;
6. That this Court grant such other and further relief, in law or in equity, as to which Plaintiff and Relator may be entitled; and
7. That Plaintiff and Relator be granted a jury trial.

Respectfully submitted,

_____
Shane C. Sidebottom (OH#: 0071918)
Ziegler and Schneider, PSC
P.O. Box 175710
541 Buttermilk Pike, Suite 500
Covington, Kentucky 41017
ssidebottom@zslaw.com

*Trial Attorney for Relator*

and

C. Dean Furman, Jr.
Furman & Nilsen, PLLC
2527 Nelson Miller Parkway, Ste. 101
Louisville, Kentucky 40223
(502) 245-8883
(502) 244-8383 (facsimile)
dean@lawdean.com

(*Pro hac* motion pending)

*Co-Counsel for Relator*

## **VERIFICATION**

The undersigned hereby certifies to the best of her knowledge and belief the accuracy of the foregoing statements.

_____
Melissa Brown

STATE OF ___Kentucky___     )
                            )SS:
COUNTY OF ___Kenton___      )

Subscribed, sworn to and acknowledged before me this 28th day of January, 2020, by Melissa Brown.

Shane C. Sidebottom
State At Large, Kentucky
Notary Public
Commission No. 571160
My Commission Expires 1/17/2021

_____
Notary Public: State at Large
My Commission Expires: _____

16

**CERTIFICATE OF SERVICE**

This will certify that a true copy of the Complaint, Civil Cover Sheet, the Disclosure Statement, and the Motion to Seal was this 28th day of January, 2020, mailed via registered mail to the Hon. William Barr, United States Attorney General, 5111 Main Justice Bldg., 10th St. & Constitution Ave., N.W., Washington, D.C. 20530, and to Hon. David DeVillers, U.S. Attorney's Office, 303 Marconi Boulevard, Suite 200, Columbus, OH 43215.

_____
Shane C. Sidebottom